**SCHOOL DISTRICT OF THE CITY OF YORK, Petitioner,**

v.

**LINCOLN–EDISON CHARTER SCHOOL, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 9, 2002.

Decided May 8, 2002.

Gregory H. Gettle, York, for petitioner.

Daniel M. Fennick, York, for respondent.

BEFORE: PELLEGRINI, J., LEAVITT, J., DOYLE, Senior Judge.

## OPINION BY Judge PELLEGRINI.

The School District of the City of York (School District) petitions for review of an order of the State Charter Appeal Board (Board) upholding its previous decision which reversed the School District's decision to deny Lincoln–Edison Charter School's (Lincoln–Edison) charter school application and continuing the charter.[1]

On November 15, 1999, Lincoln–Edison, a Pennsylvania non-profit corporation, submitted a charter school application to the School District seeking to convert Lincoln Elementary School pursuant to the Charter School Law (CSL).[2]  Upon filing its

---

1. In addition to reversing the School District's denial of the charter school application, the Board also directed the School District to grant Lincoln–Edison's application and sign Lincoln–Edison's charter.

2. Act of March 10, 1949, P.L. 30, added June 19, 1997, P.L. 225, 24 P.S. §§ 1–1701–A—17–1732–A.

Section 1717–A of the CSL provides that a charter school may be created by converting an existing public school, stating, in part:

A charter school may be established by an individual; one or more teachers who will teach at the proposed charter school; parents or guardians of students who will attend the charter school; any nonsectarian college, university or museum located in this Commonwealth; any nonsectarian corporation not-for-profit, as defined in 15 Pa.C.S. (relating to corporations and unincorporated associations); any corporation, association, partnership; or any combination thereof. A charter school may be established by creating a new school or by converting an existing public school or a portion of an existing public school. No charter school shall be established or funded by and no charter shall be granted to any sectarian school, institution or other

application, Lincoln–Edison disclosed its intention to enter into a management agreement under which Edison Schools, Inc. (Edison), a for-profit corporation, would provide the school with educational and administrative services.

After hearing testimony at a public hearing on January 13, 2000, and during a regularly scheduled meeting on March 15, 2000, the School District voted seven-to-one to deny the charter school application. After facially securing the requisite number of signatures to appeal the School District's denial as required by Section 1717–A(i)(2) of the Law,[3] Lincoln–Edison then submitted a petition to appeal to the York County Court of Common Pleas (trial court) for a determination of the sufficiency of the signatures. By decree dated May 10, 2000, the trial court held that the petition was sufficient, and on May 12, 2000, Lincoln–Edison filed its appeal with the Board.[4]

■ Following a hearing, the Board reversed the determination of the School District and ordered it to grant Lincoln–Edison's charter. The School District then appealed to this court. Concluding that proper review of a charter application cannot be had until the essential components of the application, such as a manage-

ment agreement, are before the Board, and Lincoln–Edison only submitted a "model" management agreement, we held that the Board erred in granting Lincoln–Edison's charter based upon that "model" agreement and remanded the matter for a hearing and determination by the Board as to whether a charter should be granted based on the final management agreement between Lincoln–Edison and Edison. *School District of The City of York v. Lincoln–Edison Charter School,* 772 A.2d 1045 (Pa.Cmwlth.2001). On remand, after conducting a hearing and reviewing the final management agreement between Lincoln–Edison and Edison, the Board found that the final management agreement satisfied the requirements of the CSL granting Lincoln–Edison's appeal and continued its charter. This appeal followed.[5]

**I.**

■ The School District contends that the Board erred in granting Lincoln–Edison's charter application because of the relationship between the charter school and Edison, a for-profit company. It argues that the management agreement entered into between Lincoln–Edison and Edison vests control of the charter school in Edison and not the charter school's Board of Trustees. Specifically, it argues

entity. No funds allocated or disbursed under this article shall be used to directly support instruction pursuant to section 1327.1.
24 P.S. § 17–1717–A(a).

3. To be eligible to appeal the denial of a charter by the local board of· directors, the applicant must obtain the signatures of at least two per centum of the residents of the school district or of 1,000 residents, whichever is less, who are over 18 years of age.

4. On May 15, 2000, the School District filed a petition with the Board requesting that it not consider the appeal filed by Lincoln–Edison. Then, at oral argument before the Board on

June 15, 2000, the School District withdrew its petition to dismiss the appeal. However, the School District subsequently refiled the petition.

5. Because the Board is the administrative agency charged with exclusive review of an appeal of a local school board decision not to grant a charter application, our review is appellate. Therefore, we shall affirm the Board's determination unless we find that the adjudication violates constitutional rights, is not in accordance with the law, or is not supported by substantial evidence. *Shenango Valley Regional Charter School v. Hermitage School District,* 756 A.2d 1191 (Pa.Cmwlth. 2000).

that under the management agreement, Lincoln–Edison's board of trustees does not have adequate control over the charter school because it is not free to establish rules, regulations and procedures,[6] it did not maintain budgetary control of the charter school,[7] and its power to terminate

**6.** The School District argues that the trustees are not free to establish rules, regulations and procedures because under Section 4.6 of the management agreement, Edison and the charter school's trustees jointly adopt rules and regulations concerning standards of student conduct and student discipline. That section *specifically provides:*

> **Rules and Regulations.** The Charter Holder hereby authorizes Edison to adopt and enforce such rules, regulations and procedures applicable to the day to day operations of the Charter School that do not conflict with federal or state laws, rules, regulations, or policies that have not been waived, including rules and regulations concerning student attendance, compulsory attendance and calendar, including without limitation hour requirements and the distinction between excused and unexcused absences, all subject to the approval and continuing oversight of the Charter Holder. The Charter Holder's approval shall not be unreasonably be withheld. Edison and the Board shall jointly adopt rules and regulations concerning standards of *student conduct* and student discipline. No student shall be removed from the Charter School for disciplinary or other reasons in excess of ten (10) school days without the express approval of the Board after a hearing held in compliance with 22 Pa.Code Chapter 12. The Charter School shall comply with all applicable federal and state laws concerning *welfare, safety and health of students.* If Edison or the Charter Holder identify any federal or state rules or regulations that substantially inhibit the implementation of the Edison School Design at the Charter School, then the Charter Holder shall, with Edison's assistance, apply for and support any available waiver of any such rules or regulations.

**7.** In support of its argument, the School District cites to Sections 6.2 and 6.4 of the Management Agreement. Section 6.2 provides, in relevant part:

> **Operational and Board Expenses.** In order for Edison to operate the Charter School pursuant to the Edison School Design, the Charter Holder shall, within five business

days after their receipt, promptly remit to Edison all funds that it receives on behalf of the Charter School, less reasonable Charter Holder expenses, which shall be mutually agreed upon annually by Edison and the board as set forth in Exhibit 3 to this Agreement.

\* \* \*

Edison shall expend all funds it receives from the Charter Holder in compliance with their terms and conditions. Except as otherwise provided in this Agreement, from the funds remitted by the Charter Holder to Edison, Edison shall pay the costs associated with operating the Charter School in conformity with the Edison School Design, *as detained in the budgets approved by the* board pursuant to Section 6.3 below. If such costs exceed the funds remitted to Edison, Edison shall use its own funds to cover such excess costs. Edison will implement its "50/50 Sharing Plan" at the Charter School according to regular Edison fiscal policies. Accordingly, if, due directly to the efforts of the local management team at *the Charter School (i.e. the principal, busi*ness services manager, etc.), the financial performance of the school exceeds the targets set by Edison, half of any savings generated by such performance will be reserved by Edison to be spent on program enhancements at the Charter School consistent with the Edison School Design. Upon reasonable advance request, Edison shall *provide evidence to the Charter Holder that* the Charter School is in compliance with the requirements, terms and conditions of all funds remitted to Edison and shall provide all reports, data, and information reasonably necessary for the Charter School to meet any reporting, certification or other requirements for such funding.

Section 6.4 provides:

**Edison's Compensation.** In light of Edison's start-up investments and its obligations to pay the operating costs of the Charter School pursuant to Section 6.2 above, Edison shall retain any excess of the funds received pursuant to Section 6.1 above over expenditures as compensation for the variety of educational and management services it provides under this Agree-

the agreement as a way to assure Edison's performance was an illusory and inadequate remedy.[8]

Whether a charter school was entitled to a charter based upon its relationship with a for-profit entity was addressed by this court in *West Chester Area School District v. Collegium Charter School,* 760 A.2d 452 (Pa.Cmwlth.2000), *petition for allowance of appeal granted,* 566 Pa. 674, 782 A.2d 552 (2001). In that case, Collegium Charter School filed a charter application with West Chester Area School District indicating that it intended to enter into a management agreement with Mosaica Education, Inc., a for-profit corporation, under which Mosaica would provide the school with educational and administrative services. The school district denied Collegium's application, however, and the Charter Appeal Board reversed the school district's determination and directed the school district to grant Collegium's charter application. On appeal, we held that a charter school may contract with a for-profit corporation in order to operate the charter school, stating:

> [T]here is no question that the CSL permits a charter school to be *estab-*

*lished* by "any corporation," even if that corporation is a for-profit entity. Therefore, as conceded by Petitioners, Mosaica was legally eligible to complete and submit the charter Application for Collegium. Clearly, however, the legislature did not want to entrust the management and operation of the charter school itself to entities seeking to make money from the school's management and operation; rather, that power is granted to the charter school's board of trustees who, as public officials, have a single purpose to promote the interests of the pupils. To this end, section 1716–A(a) of the CSL vest the charter school's board of trustees with the "authority to decide matters related to the operation of the school, including, but not limited to, budgeting, curriculum, and operating procedures, subject to the school's charter." In addition, the trustees have "the authority to employ, discharge and contract with necessary professional and nonprofessional employes subject to the school's charter." 24 P.S. § 17–1716–A(a). The board of trustees also determines the level of compensation and all terms and conditions of staff employ-

ment. It is expressly agreed that any funds donated to the Charter Holder for charitable purposes or grants received by the Board due to its own efforts, however, shall not be retained by Edison as part of its compensation. To the extent that any such charitable or grant funds are remitted to Edison, Edison will spend such funds only in compliance with the Charter Holder's directions and consistent with the terms of such funds, if any.

8. The School District argues that because the termination clause in Section 11.1(a)(1) and (2) uses undefined terms such as "reasonable progress," "high standards" and "substantially," Lincoln–Edison's ability to terminate the management agreement is illusory.

**Charter Holder Termination for Cause.** (a) The Charter Holder may terminate this

Agreement for cause prior to the end of the term specified in Article 2 of this Agreement, in accordance with the procedures set forth in subsection (b) below, for any of the reasons set forth in subparagraphs (1), (2) and (3) below:

(1) if, at any time after the first academic year under Edison's management, the Charter School has failed to make reasonable progress toward student academic achievement; provided that the Charter Holder has advised Edison in writing that its performance has been deficient and has allowed Edison at least one academic year in which to remedy such failures:

(2) if Edison substantially breaches any of the material terms and conditions of this Agreement and fails to remedy such breach within 90 days after receipt of written notice of such breach from the Charter Holder[.]

ment. However, the CSL does not prohibit charter schools from contracting out certain management and administrative responsibilities to a for-profit corporation. Rather, the CSL grants charter schools all powers necessary or desirable for carrying out its charter, including, but not limited to, the power to acquire real property by purchase or lease and the power to make contracts or leases for the procurement of services, equipment and supplies. Thus as the CAB properly concluded, nothing in the [CSL] prohibits the involvement of for-profit entities in the establishment and operation of a charter school, so long as the school itself is not for-profit, the charter school's trustees have real and substantial authority and responsibility for the educational decisions, and the teachers are employees of the charter school itself. (Emphasis in the original.) (Citations omitted.)

As to the arrangement between Collegium and Mosaica, our review of the record indicated that Collegium's by-laws and its charter school application specifically provided that Collegium's board of trustees had full authority to operate the school, including determining general, academic,

financial, personnel and other policies as outlined in the CSL. Because nothing in the arrangement between Collegium and Mosaica would deprive Collegium's trustees of ultimate control of the charter school, we held that the arrangement was permitted under the CSL. *See also Brackbill v. Ron Brown Charter School,* 777 A.2d 131 (Pa.Cmwlth.2001).

In this case, nothing in the Management Agreement would deprive Lincoln–Edison trustees of ultimate control of the charter school. Section 1.2 of the Management Agreement.[9] Lincoln–Edison must approve any rules, regulations and procedures adopted by Edison for the day-to-day operations of the charter school. Section 4.6 of the Management Agreement. Lincoln–Edison must approve annual projected budgets submitted by Edison and must approve any material changes to the approved budgeted expenditures. Section 6.3 of the Management Agreement.[10] Moreover, Lincoln–Edison has the authority to terminate the Management Agreement if Edison fails to make reasonable progress toward student achievement, provided Edison is allowed one academic year to remedy any such failures, or if Edison

**9.** That Section provides:

**Authority.** In performing its duties and obligations under this Agreement, and subject at all times to the oversight and approval of the Charter Holder as provided herein, Edison shall take such actions as are necessary or desirable to properly and efficiently operate the Charter School consistent with federal and State law and subject to other terms and conditions of this Agreement, the Charter Agreement, and the oversight of the Board as provided for herein, to take such actions as may be necessary or desirable to properly and efficiently operate the Charter School on behalf of the Board.

**10.** Section 6.3 of the Management Agreement provides:

**Budgets.** Edison shall provide the Board with an annual projected budget, in reason-

able detail, for the Charter School within 30 days after execution of the Agreement. For each subsequent school year, Edison shall provide to the Board for approval, not later than June 30 of each year during the Term and annual projected budget for the operations of the School for the then-upcoming academic year (the "**Budget**"). If the actual fees reasonably projected to be collected by Edison during the fiscal year with respect to the charter School fall below those projected in the Budget, each party shall promptly notify the other party in writing. Edison shall notify the Board of its proposed budget amendments to offset such revenue shortfalls. Any material changes to the approved budgeted expenditures require Charter Holder approval.

substantially breaches any material terms and conditions and fails to remedy the breach within 90 days. Sections 11.1(a)(1) and (2) of the Management Agreement.

Initially, in each of the provisions cited by the School District, although Edison is entrusted with the authority to make necessary decisions regarding the day-to-day operation of the charter school, the board of trustees, at all times, retains the authority to oversee and approve those decisions. Based upon our review of the Management Agreement, there is sufficient evidence to support the Board's finding that Lincoln–Edison's board of trustees retained ultimate control over the charter school, and,

therefore, the Board did not err in granting Lincoln–Edison's appeal on that basis.

## II.

■ The School District also argues that Lincoln–Edison was not eligible for a charter application because the Management Agreement between it and Edison gives Edison too much control of the teachers at the charter school in violation of Section 1716–A(a),[11] 1724–A(a)[12] and 1727–A[13] of the CSL. It argues that the Management Agreement improperly delegates control of the teachers at the charter school to Edison with respect to hiring and firing of staff,[14] the instructional material

11. Section 1716–A(a) of the CSL provides:

The board of trustees of a charter school shall have the authority to decide matters related to the operation of the school, including, but not limited to, budgeting, curriculum and operating procedures, subject to the school's charter. The board shall have the authority to employ, discharge and contract with necessary professional and nonprofessional employes subject to the school's charter and the provisions of this article.

24 P.S. § 17–1716–A(a).

12. Section 17–1724–A(a) of the CSL provides for the charter school staff, stating, in part:

The board of trustees shall determine the level of compensation and all terms and conditions of employment of the staff except as may otherwise be provided in this article. At least seventy-five per centum of the professional staff members of a charter school shall hold appropriate State certification. Employes of a charter school may organize under the act of July 23, 1970 (P.L. 563, No. 195), known as the "Public Employe Relations Act." The board of trustees shall be considered an employer for the purposes of Article XI–A. Upon formation of one or more collective bargaining units at the school, the board of trustees shall bargain with the employes based on the provisions of this article, Article XI–A and the "Public Employe Relations Act."

24 P.S. § 17–1724–A(a).

13. Section 1727–A of the CSL provides:

For purposes of tort liability, employes of the charter school shall be considered public employes and the board of trustees shall be considered the public employer in the same manner as political subdivisions and local agencies. The board of trustees of a charter school and the charter school shall be solely liable for any and all damages of any kind resulting from any legal challenge involving the operation of a charter school. Notwithstanding this requirement, the local board of directors of a school entity shall not be held liable for any activity or operation related to the program of the charter school.

24 P.S. § 17–1724–A.

14. Section 7.1 of the Management Agreement provides:

**Personnel Responsibilities.** All personnel working at the Charter School shall be employees of the Charter Holder, except for the Business Services Manager and such other employees mutually agreed on by Edison and the Charter Holder. However, the Charter Holder hereby authorizes Edison to determine staffing levels in the Charter School and to select, evaluate, assign, and discipline personnel consistent with federal and state laws, rules, and regulations (unless waived by appropriate authorities), and policies, rules and regulations that may be adopted by the Board. However, the Charter Holder shall have final decision-making authority regarding the hiring of all staff members and must grant prior approval for

developed by the teachers,[15] compensation and other terms and conditions of employment [16] and collective bargaining.[17]

However, Section 7.1 of the Management Agreement specifically provides that all personnel working at the charter school

the employment and/or dismissal of all staff members.

Section 7.2 of the Management Agreement provides:

**Selection of Personnel.** The Charter Holder hereby authorizes Edison, consistent with state law and subject to approval of the Charter Holder, to select or dismiss the Charter School principal. Edison will supervise each principal and hold her or him accountable for the success of the Charter School. Subject to Section 7.1 of this Agreement and the oversight of the Board, including but not limited to the Board's final decision-making authority regarding the *employment and dismissal of all staff* members, Edison and the principal shall have authority to select and supervise the teachers and the non-instructional staff in the Charter School.

15. Section 8.1 of the Management Agreement provides, in part:

**Proprietary Information.** Edison shall own all copyright and other proprietary rights to all instructional materials, training materials, curriculum and lesson plans, and any other materials developed by Edison, its employees, agents or subcontractors, or by any individual including Charter School employees working for, or supervised by, Edison.

16. Section 7.3 of the Management Agreement provides:

**Employment Terms.** In accordance with *its rights and obligations under Section 1724–A* of Pennsylvania Act 22 of 1997, the Charter Holder hereby authorizes that employees at the Charter School will be compensated according to Edison's compensation policies, which may include performance-based incentives and Edison stock options. The levels of compensation for all staff members shall be included in the annual budget, which shall be provided to the Charter Holder for approval in accordance with Section 6.3 of this Agreement.

shall be Lincoln–Edison employees, with the exception of the Business Services Manager. That section further provides that Lincoln–Edison has final decision-making authority regarding the hiring of all staff members and must grant approval

Section 7.4 of the Management Agreement provides:

**Employee Salaries and Benefits.** Edison shall pay the costs of the salaries, fringe benefits and employment taxes of Charter School employees on behalf of the Charter Holder and for Edison employees working at the Charter School.

Section 7.6(a) of the Management Agreement provides:

**Personnel Policies.** (a) Subject to § 7.1 of this Agreement the Charter Holder hereby adopts Edison's employment policies, consistent with the Edison School Design and in compliance with federal and state law, concerning the recruitment, assignment, promotion, discipline and termination of personnel and the methods and standards for evaluating performance. A copy of Edison's Human Resources and Benefits Guide in [sic] attached (Exhibit 5). Any material modification to these employment policies require Charter Holder approval to their adoption.

17. Section 7.7 of the Management Agreement provides:

**Collective Bargaining Agreements.** The Charter Holder agrees to consult with Edison before entering into any collective bargaining relationship with any union which might represent employees of the Charter School.

Section 11.2(a)(1) of the Management Agreement provides:

**Edison Termination for Cause.** (a) Edison may terminate this Agreement for cause prior to the end of the term specified in Article 2 of this Agreement, in accordance with the procedures set forth in subsection (b) below, for any reasons set forth in subparagraphs (1), (2), (3), or (4) below:

(1) If the Charter Holder fails to adopt the reasonable personnel, curriculum, program or similar recommendations of Edison with respect to the Charter School, which Edison reasonably determines to be necessary for the implementation of the Edison School Design at the Charter School.

for the employment and/or dismissal of all staff members. Section 7.3 of the Management Agreement provides that the level of compensation for all staff members must be included in the annual budget, which is subject to the approval of the Board of Trustees, and Section 7.4 provides that Edison will pay the charter school employees on behalf of Lincoln–Edison. Additionally, Section 7.6 of the Management Agreement provides that Lincoln–Edison must approve any material modification to employment policies. Because the provisions of the Management Agreement provided the board of trustees with the authority to ultimately decide, through its oversight and approval of Edison, matters related to the operation of the school such as the hiring and discharge of charter school staff and the level of compensation and other terms and conditions of the employment of that staff, there was sufficient evidence to support the Board's finding that the employees at the charter school are Lincoln–Edison employees, not Edison employees.

### III.

■ Finally, the School District contends that the Board erred in granting a charter to Lincoln–Edison because its charter application did not contain any lease arrangements for the Lincoln Elementary School Building as required by the CSL and because Lincoln–Edison refused to pay rent for its use of the building. Lincoln–Edison, however, argues that neither lease arrangements nor rent were required because, as a conversion charter school, it was entitled to use the Lincoln Elementary School Building without a lease or the payment of rent.

■ Like most provisions of the CSL, this issue is dealt with only in the most minimalist way. Leases are only addressed in Section 1719–A of the CSL

which sets forth the requirements for the contents of a charter school application. That section provides, in relevant part, "[a]n application to establish a charter school shall include all of the following information ... (11) A description of and address of the physical facility in which the charter school will be located and the ownership thereof and *any lease arrangements*." 24 P.S. § 17–1719–A(11) (emphasis added). Because there is nothing in Section 1719–A that differentiates between the requirement of the contents of a charter application filed seeking to establish a conversion charter school and an application to establish a non-conversion charter school, this provision applies to all charter applications, including those seeking to establish a conversion charter school. To interpret Section 1719–A otherwise would allow a conversion charter school to occupy a public school building with no requirements or restrictions for such things as maintenance or upkeep of the building and property and provide no recourse to the school district and its taxpayers in the event that the building or property is damaged.

■ The next question then is how the terms of a lease are determined. When a charter school applicant files an application with the local board of school directors within the school district seeking to establish a conversion charter school, it is required to submit a proposed lease pursuant to Section 1719–A of the CSL. After public hearing and an evaluation of the charter application, the local board of school directors must then decide to grant or deny the application, including the proposed lease arrangement for the public school building which the charter applicant seeks to use for the charter school. While both the school district and the applicant can and should negotiate over the terms, if the two parties are unable to reach an

agreement, the charter application can be denied by the school district on the basis that the applicant failed to provide sufficient lease arrangements pursuant to Section 1719–A(11) of the CSL. If the charter application is denied, including denial based on inadequate lease arrangements, the charter applicant then has the right to a de novo review of the charter application by the Board. At that point, the Board should evaluate the proposed lease to determine whether it adequately protects the public investment, e.g., provisions regarding maintenance of the building and terms to insure that the building can be returned to the school district in the same condition if the charter school fails or ceases operation. The board's decision on whether to grant or deny the application would then finalize the lease terms which the school district would be required to execute. Accordingly, the CSL does not require a charter applicant to have an executed lease with the school district; however, it does require that the applicant provide lease arrangements that it proposes to enter for the "conversion building" if the charter is granted. The determination as to whether the proposed lease arrangements are acceptable would then be decided by the Board in its review of the charter application.

In this case, we must first determine whether the issue regarding Lincoln–Edison's leasing arrangement is properly before us. When we initially considered the case, the Board had found the proposed lease arrangements sufficient for the purposes of the CSL. In its July 25, 2000 Opinion and Order, the Board addressed the lease arrangement issue stating:

> The Application does include evidence of the terms and conditions under which the Charter School would use the Lincoln Elementary School. The model management agreement provides details about the condition the building must be in, costs related to additional or upgraded electrical or networking service, access to the building by all parties concerned, and the kind of equipment the School District shall supply including, but not limited to, desks, furniture and the like. *Application* at 932. The model management agreement also provides for capital repairs, improvements, security, transportation and food. *Id.* at 933. In addition, the model management agreement specifies Edison's ability to make building adaptations and Edison's responsibilities concerning cleaning and maintenance. *Id.* at 932; *see also Application* at 29–30. We also conclude that the Application contemplates a lease instead of a sale since the model management agreement states that, "[t]itle to the School Facilities shall not be transferred to Edison or the Charter Holder." *Id.* Therefore, we hold that these provisions of the model management agreement describe the lease arrangements "in at least a general way." *In Re: Appeal of Phoenix Academy Charter School, Docket No. CAB 1999–10* at 21–22.

We also note that it may be very difficult for a charter school applicant to provide extensive details about the leasing of a building from the school district that owns the building when the school district is, as in this case, opposed to the conversion. While an actual rental agreement, the cost of the rental agreement and other such provisions are not provided, the Model Management Agreement provides enough information to satisfy the requirement of the Charter School Law.[18]

---

18. The proposed lease described appears to be a "triple net lease" or a "closed lease"

(July 25, 2000 Order and Opinion of the Charter Appeal Board at 15–16.) (Emphasis in the original.) In its earlier decision, the Board relied solely on the Model Management Agreement to determine whether Lincoln–Edison fulfilled the requirements of Section 1719–A of the CSL; however, as we held on appeal, "the Board cannot grant a charter based on a 'model' agreement or promises that after negotiations it will comply with the law." *Lincoln–Edison,* 772 A.2d at 1050.

On remand, the School District petitioned the Board to clarify its earlier decision and determine whether Lincoln–Edison, as a conversion charter school, was required to enter into a lease with the School District and pay rent. Considering the petition to be an application for rehearing under 1 Pa.Code § 35.241, the Board dismissed it as being untimely filed. However, because a charter school is required to provide leasing arrangements in order to obtain a charter, and this court had previously vacated the Board's order granting Lincoln–Edison's charter, that issue was properly before the Board on remand.

Accordingly, because the Board did not address whether Lincoln–Edison's charter application, including the finalized Management Agreement, included a lease that Lincoln–Edison proposed to enter into for the Lincoln Elementary School Building that could be executed if found to be in accordance with the CSL, we must remand this matter to it to determine whether Lincoln–Edison proposed adequate lease arrangements for the use of the Lincoln Elementary School Building that entitled it to a conversion charter. As part of those lease arrangements, the Board is to determine if Lincoln–Edison is required to pay rent under the CSL to the School District for its use of the building, and, if so, the amount of rent.

### ORDER

AND NOW, this *8th* day of *May,* 2002, the order of the Charter Appeal Board, No. CAB 2000–11–A, dated July 5, 2001, is vacated and the matter is remanded to the Charter Appeal Board to determine whether Lincoln–Edison Charter School proposed adequate lease arrangements for the use of the Lincoln Elementary School Building that entitled it to a conversion charter. As part of those lease arrangements, the Charter Appeal Board is to determine if Lincoln–Edison Charter School is required to pay rent to the School District of the City of York for its use of the building, and, if so, the amount of rent. Pending resolution of this matter by the Charter Appeal Board, the charter of Lincoln–Edison Charter School shall remain in effect.

Jurisdiction relinquished.

where the lessee is to pay all expenses normally associated with ownership.