# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Insight PA Cyber Charter School, :
                    Petitioner :
  :
      v. : No. 1866 C.D. 2015
  : Argued: February 8, 2017
Department of Education, :
             Respondent :


BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE JULIA K. HEARTHWAY, Judge
              HONORABLE JOSEPH M. COSGROVE, Judge


**OPINION BY JUDGE BROBSON**          **FILED: May 18, 2017**


Insight PA Cyber Charter School (Insight) petitions this Court for review of the adjudication of the Pennsylvania State Charter School Appeal Board (CAB), which denied Insight's cyber charter school[1] application, because the CAB concluded that (a) the trustees of Insight will lack "real and substantial authority

---

[1] A "cyber charter school" is defined in Section 1703-A of the Charter School Law (CSL), Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. § 17-1703-A, as follows:

> [A]n independent public school established and operated under a charter from the Department of Education and in which the school uses technology in order to provide a significant portion of its curriculum and to deliver a significant portion of instruction to its students through the Internet or other electronic means. A cyber charter school must be organized as a public, nonprofit corporation. A charter may not be granted to a for-profit entity.

over the management of the cyber charter school," and (b) "fundamental budgeting issues exist which affect the ability of Insight to provide a comprehensive learning experience to its students." (CAB Op. at 22-23, 30.) For the reasons set forth below, we now reverse and remand with direction that Respondent Pennsylvania Department of Education (Department) issue a charter to Insight.

## I. BACKGROUND

On October 1, 2014, Insight, a Pennsylvania nonprofit corporation, filed an application with the Department, seeking to establish a cyber charter school serving grades kindergarten through 12. The application provides that pursuant to a September 29, 2014 Amended and Restated Educational Products and Services Agreement (Agreement), K12 Virtual Schools LLC (K12), a for-profit educational products and services company, would provide the school's curriculum, educational materials, and educational management services through June 30, 2020.

On November 14, 2014, the Department held a public hearing on Insight's application. On January 17, 2015, Insight and K12 executed an amendment to the Agreement (2015 Amendment). On January 29, 2015, the Department issued a decision denying Insight's application for the following reasons: (1) Insight lacked real and substantial authority over the school's operations; (2) Insight failed to demonstrate compliance with technology requirements; (3) Insight failed to demonstrate an ability to meet the needs of special education students; (4) Insight failed to demonstrate an ability to meet the needs of students who are not fluent in English; (5) Insight failed to demonstrate a sufficient understanding of academic assessment and

2

accountability; and (6) Insight failed to demonstrate necessary financial support and planning.

On February 27, 2015, Insight appealed to the CAB. In an Opinion and Order entered on August 31, 2015 (Opinion), the CAB rejected most of the Department's asserted grounds for denial. Nonetheless, the CAB affirmed the denial of the charter, concluding that Insight's governing body, its Board of Trustees (Board), lacked real and substantial authority over the school's staffing, budget, and curriculum and that Insight failed to demonstrate the necessary financial support and planning to operate a cyber charter school.[2] Insight now petitions for review of the CAB's decision.[3]

## II. DISCUSSION

### A. "Real and Substantial Authority" Test

The first issue in this appeal relates to the contractual arrangement between Insight and its chosen service provider, K12. This Court first addressed the subject of charter school contracts with for-profit service providers in *West Chester Area School District v. Collegium Charter School*, 760 A.2d 452 (Pa. Cmwlth. 2000) (*Collegium*), *aff'd*, 812 A.2d 1172 (Pa. 2002).

---

[2] With respect to the other bases for the Department's denial, the CAB concluded that Insight demonstrated compliance with technology requirements and the ability to meet the needs of special education students and students who are not fluent in English. (CAB Op. at 23-28.) The CAB declined to consider whether Insight demonstrated a sufficient understanding of academic assessment and accountability because the Department did not raise that issue before the CAB. (CAB Op. at 5 n.7.)

[3] Our review of the CAB's decision is limited to determining whether constitutional rights were violated, whether the CAB committed an error of law, or whether the CAB's decision is supported by substantial evidence. *New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.3d 731, 736 (Pa. Cmwlth. 2014).

In *Collegium*, the CAB reversed a local school district decision and directed that the school district award a charter to Collegium Charter School (Collegium). On appeal, taxpayers and the school district complained that the CAB erred because Collegium was not an independent nonprofit entity. The petitioners argued that Collegium was, instead, "a mere shell for a for-profit entity rather than a non-profit corporation." *Collegium*, 760 A.2d at 468. That for-profit entity was Mosaica Education, Inc. (Mosaica). According to the charter school application, Collegium intended to enter into a management agreement with Mosaica under which Mosaica would provide the charter school with educational and administrative services, including access to its proprietary Paragon Curriculum. *Id.* at 455. The petitioners contended that the relationship between Mosaica and the charter school vested too much authority in Mosaica and divested Collegium's board of trustees of ultimate control over the major decisions affecting the school. *Id.* at 469.

In evaluating the petitioners' challenge, this Court first looked to the Charter School Law (CSL).[4] We recognized provisions of the CSL that place the ultimate authority over the governance of a charter school in the hands of the school's board of trustees:

> Clearly, . . . the legislature did not want to entrust the management and operation of the charter school itself to entities seeking to make money from the school's management and operation; rather, that power is granted to the charter school's board of trustees who, as public officials,[ ] have a single purpose to promote the interests of pupils.

---

[4] Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§ 17-1701-A to -1732-A.

*Id.* at 468 (footnote omitted). Section 1716-A(a) of the CSL, 24 P.S. § 17-1716-A, for example, vests the charter school's board of trustees with "the authority to decide matters relating to the operation of the school, including, but not limited to, budgeting, curriculum and operating procedures, subject to the school's charter." That provision also vests with the board "the authority to employ, discharge and contract with necessary professional and nonprofessional employees subject to the school's charter and the provisions of this article." *Id.* In *Collegium*, we also noted that the board of trustees has the power to set staff compensation and terms and conditions of employment. *See* Section 1724-A(a) of the CSL, 24 P.S. § 17-1724-A(a). Nonetheless, like the CAB, we recognized that the board of trustees also has the option to contract with for-profit entities for goods and services. *See* Section 1714-A(a)(3) and (5) of the CSL, 24 P.S. § 1714-A(a)(3), (5).[5]

Reconciling these powers within the board of trustees, we adopted the CAB's articulation of the governing legal test:

---

[5] These portions of the CSL provide:

A charter school established under this act is a body corporate and shall have all powers necessary or desirable for carrying out its charter, including, but not limited to, the power to:

. . .

(3)     Acquire real property from public or private sources by purchase, lease, lease with an option to purchase or gift for use as a charter school facility;

. . .

(5)     Make contracts and leases for the procurement of services, equipment and supplies.

Section 1714-A(a)(3), (5) of the CSL.

"[N]othing in the [CSL] prohibits the involvement of for-profit entities in the establishment and operation of a charter school, so long as the school itself is not for-profit, *the charter school's trustees have real and substantial authority and responsibility for the educational decisions*, and the teachers are employees of the charter school itself."

*Collegium*, 760 A.2d at 468 (quoting CAB decision) (second alteration in original) (emphasis added). Applying this test, we agreed with the CAB and rejected the petitioners' challenge:

> After a review of the record, we agree with the CAB that there is nothing to indicate that the arrangement between Mosaica and Collegium would deprive Collegium's trustees of ultimate control of the charter school, and we see nothing in the CSL to prevent a for-profit entity such as Mosaica from assuming the role that it will have here. Specifically, Collegium's articles of incorporation state that Collegium is organized as a non-profit corporation under Pennsylvania law. Further, Collegium's bylaws and its charter school [a]pplication both state that the board of trustees has full authority to operate the school, including determining general, academic, financial, personnel and other policies, as outlined in the CSL. In addition, Mosaica's agreement with the charter school in Bensalem, which was represented as a model for the agreement between Mosaica and Collegium, makes clear that the board of trustees is independent from Mosaica and that Mosaica can exercise no authority which may not be delegated by the [Public] School Code [of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 to 27-2702,] and other applicable laws and resolutions. Mosaica representatives also responded to concerns of the District Board, assuring the District Board that none of Collegium's board of trustees would have any financial interest in, or receive compensation from, Mosaica, and that the trustees retained the power to negotiate the terms of the contract with Mosaica and to terminate that contract.

6

*Id.* at 469-70. The Pennsylvania Supreme Court affirmed our decision in *Collegium*, observing:

> The management agreement contracted for educational and administrative services to be performed by Mosaica. Contrary to Appellants' contentions, nothing in the management agreement supports the claim that Collegium was not an independent, nonprofit corporation or that Mosaica would retain the ultimate control over operation of the charter school. To the contrary, the agreement affords Mosaica all authority and power necessary to undertake its obligations under the agreement, "*except in cases wherein such authority may not be delegated by the Code and other applicable laws and resolutions.*" Further, the agreement expressly clarifies that the charter school "is not a division or a part of [Mosaica]," and that neither party has the power to bind or legally operate the other. It goes on to state that Mosaica "will not have any role or relationship with the Charter School that, in effect, substantially limits the Charter School's ability to exercise its rights, including cancellation rights under this Agreement."

*West Chester Area Sch. Dist. v. Collegium Charter Sch.*, 812 A.2d 1172, 1185 (Pa. 2002) (citations omitted) (emphasis in original) (*Collegium II*); *see also Brackbill v. Ron Brown Charter Sch.*, 777 A.2d 131, 137 (Pa. Cmwlth. 2001) (applying *Collegium* and rejecting contention that management agreement stripped board of trustees of its authority over school operations), *appeal denied*, 821 A.2d 588 (Pa. 2003).

We applied the "real and substantial authority" test in *Carbondale Area School District v. Fell Charter School*, 829 A.2d 400 (Pa. Cmwlth. 2003) (*Fell*), again affirming the CAB's award of a charter to a school that proposed to enter into a management agreement with Mosaica. *Fell*, 829 A.2d at 401. In *Fell*, the school district that denied that charter school application contended that the management agreement delegated too much responsibility to Mosaica, including,

7

*inter alia*, responsibility for preparing budgets, supervision and discipline of school personnel, determining staffing levels at the school, and selection and employment of the school principal. *Id.* at 406. Engaging in a similar analysis to that in *Collegium*, we opined:

> With regard to the specific responsibilities the District alleges will be transferred to Mosaica, our review of the record reveals that nothing in the charter would prevent the Board of Trustees from exercising ultimate control of the charter school. Fell's articles of incorporation list it as a non-profit corporation in Pennsylvania. Additionally, Fell's by-laws state that the Board of Trustees "has ultimate responsibility to determine general, academic, financial[,] personnel and related policies deemed necessary for the administration and development of the Charter School in accordance with its stated purpose and goals." Further, the Management Agreement specifically provides that Fell's Board of Trustees is independent from Mosaica and that none of Mosaica's directors, officers or employees shall be members of the Board of Trustees. Because the evidence establishes that Fell is organized as an independent, non-profit school, the CAB did not err in determining that the Management Agreement between Fell and Mosaica is permitted under the Law.

*Id.* at 407-08 (citations omitted) (alteration in original).

In *School District of City of York v. Lincoln-Edison Charter School*, 798 A.2d 295 (Pa. Cmwlth. 2002) (*Lincoln-Edison*), the CAB reversed a decision by a local school district and directed the school district to award a charter to Lincoln-Edison Charter School (Lincoln-Edison), notwithstanding the school district's contention that Lincoln-Edison's management agreement with Edison Schools, Inc. (Edison), a for-profit corporation, delegated too much authority to Edison over the management and operation of the charter school. The school district appealed. Pressing its case, the school district contended that

8

> Lincoln-Edison's board of trustees does not have adequate control over the charter school because it is not free to establish rules, regulations and procedures, it did not maintain budgetary control of the charter school, and its power to terminate the agreement as a way to assure Edison's performance was an illusory and inadequate remedy.

*Lincoln-Edison*, 798 A.2d at 298-99. After discussing *Collegium*, this Court looked to the terms of the proposed management agreement and rejected the school district's challenge:

> In this case, nothing in the Management Agreement would deprive Lincoln-Edison trustees of ultimate control of the charter school. Section 1.2 of the Management Agreement. Lincoln-Edison must approve any rules, regulations and procedures adopted by Edison for the day-to-day operations of the charter school. Lincoln-Edison must approve annual projected budgets submitted by Edison and must approve any material changes to the approved budgeted expenditures. Moreover, Lincoln-Edison has the authority to terminate the Management Agreement if Edison fails to make reasonable progress toward student achievement, provided Edison is allowed one academic year to remedy any such failures, or if Edison substantially breaches any material terms and conditions and fails to remedy the breach within 90 days.
>
> Initially, in each of the provisions cited by the School District, although Edison is entrusted with the authority to make necessary decisions regarding the day-to-day operation of the charter school, the board of trustees, at all times, retains the authority to oversee and approve those decisions. Based upon our review of the Management Agreement, there is sufficient evidence to support the Board's finding that Lincoln-Edison's board of trustees retained ultimate control over the charter school, and, therefore, the Board did not err in granting Lincoln-Edison's appeal on that basis.

*Id.* at 300-01(footnotes omitted) (citations to record omitted).

Applying this precedent here, we conclude that the CAB erred in its application of *Collegium* and its progeny. These opinions arose from a concern that for-profit entities might attempt to circumvent the CSL's requirements that all charter schools must be nonprofit corporations led by a board of trustees by setting up shell, or puppet, nonprofits. The for-profit entity would then control the nonprofit charter school in such a way that the focus would be on maximizing the for-profit service provider's revenues, rather than educating the enrolled students. The CAB and then this Court implemented the *Collegium* test to prevent this, recognizing the statutory authority of charter schools to contract with for-profit service providers, but requiring that the charter school board of trustees retain real and substantial authority over the charter school's operations.

Under our precedent, the *Collegium* test requires examination of the corporate documents for the charter school as well as the (proposed) management agreement with the for-profit service provider to determine whether the charter school board of directors retains ultimate control over the direction of the school. In conducting this critical examination, however, the chartering authority (whether the Department or a local school district), the CAB, and this Court should be mindful not to interject ourselves into the role of a contract scrivener or negotiator. Under the CSL and *Collegium*, management agreements must be products of arms-length negotiations between separate and independent entities. In the absence of any express or specific provision in statute, regulation,[6] or precedent

---

[6] The Court notes here that although the Department has the express authority to promulgate regulations to implement the portions of the CSL relating to cyber charter schools, the Department has not yet done so. *See* Section 1751-A of the CSL, 24 P.S. § 17-1751-A. Promulgated regulations, setting forth the Department's view of what provisions must and must **(Footnote continued on next page…)**

10

that requires or prohibits a specific term, the parties have the freedom to negotiate and to contract.

The CAB in its Opinion and the Department in its brief raise fair points about the complexity of the proposed arrangement between Insight and K12, particularly with respect to reporting structures, rights of termination, and budgeting. Many provisions of the proposed Agreement, as amended by the 2015 Amendment, could be rewritten to reduce bureaucracy, add clarity, and streamline the operations of the charter school. The same can probably be said of many government contracts or government agency reporting structures. Nonetheless, based on our reading of the Agreement and the 2015 Amendment, the Insight bylaws, and the above precedent, we conclude that the arrangement satisfies the *Collegium* test and does not violate any express provisions of the CSL. The CAB, therefore, erred in affirming the Department's denial of Insight's application.

The first *Collegium* factor is not in dispute. Insight is, itself, a nonprofit corporation. Unlike the allegations in *Collegium*, there is no contention here that Insight, or its Board, is a mere shell of a nonprofit, existing to do the bidding of K12, and thus incapable of negotiating and entering into a management services agreement that is both commercially reasonable and consistent with the Board's duty to promote the interests of the students that Insight will serve. The

---

**(continued…)**

not be included in a provider agreement to satisfy the "real and substantial authority" test would be beneficial to charter school applicants and chartering authorities.

11

third *Collegium* factor also is not in dispute. All teachers at the charter school will be employees of Insight and not K12.

The sticking point is the second factor—that being whether Insight's Board will have real and substantial authority and responsibility for the educational decisions at Insight. As noted above, this factor does not preclude K12's involvement in any or even all aspects of the management and operation of the charter school. *Lincoln-Edison*, 798 A.2d at 300-01. Instead, this factor requires us to consider whether Insight's Board, in executing the Agreement and 2015 Amendment, ceded ultimate control over the charter school to K12. *See Fell*, 829 A.2d at 407-08.

The Bylaws for Insight (Bylaws) provide:

> The Board . . . shall have the ultimate responsibility to determine general, academic, financial, personnel and related policies deemed necessary for the administration and development of [Insight] in accordance with its stated purposes and goals.

(R.R. 52a.) Similarly, Section 2.2 of the Agreement provides:

> The Board, pursuant to the Charter, is fully responsible for all governance of [Insight] and the employment of [Insight] employees, including certified teachers, the Chief Executive Officer and a Chief Financial Officer. Accordingly, *the Board is ultimately responsible for overseeing all of [Insight's] management, policy and budgeting decisions impacting [Insight] and its Students*, as detailed herein.

(R.R. 5a (emphasis added) (Insight Br. Appendix F).) Notwithstanding these provisions, the CAB identified three areas in its Opinion where it believes that the Insight Board has abdicated control to K12 in violation of the CSL and, more specifically, the *Collegium* test: (a) staffing, (b) budgeting, and (c) curriculum.

12

## 1. Staffing

In its Opinion, the CAB concluded that the proposed reporting structure for Insight's teachers is too cumbersome, with too many layers of bureaucracy between Insight's teachers and Insight's Chief Executive Officer (CEO), causing the CAB to reach the following legal conclusion under *Collegium*: "The organizational scheme creates a detachment between the teachers and the Board, . . . such that the Board lacks real and substantial managerial authority over the teaching staff." (CAB Op. at 19.) The CAB also concluded that Insight's Board lacks adequate control over K12 employees assigned to the school, particularly over their employment status, compensation, and discipline. (CAB Op. at 20.)

To support denial of a charter school application that includes a contract for management services, the proposed organizational structure must be more than merely cumbersome; it must actually violate some legal standard. The CAB's criticisms are not supported by any established statutory or regulatory standards. In its discussion of staffing, the CAB cited only two provisions from the CSL, made applicable to cyber charter schools pursuant to Section 1749-A(a)(1) of the CSL, 24 P.S. § 17-1749-A(a)(1). (CAB Op. at 18.) The first is Section 1716-A(a) of the CSL, 24 P.S. § 17-1716-A(a), which provides:

> The board of trustees of a charter school shall have the authority to decide matters related to the operation of the school, including, but not limited to, budgeting, curriculum and operating procedures, subject to the school's charter. The board shall have the authority to employ, discharge and contract with necessary professional and nonprofessional employees subject to the school's charter and the provisions of this article.

The second is Section 1724-A(a) of the CSL, which provides:

> The board of trustees shall determine the level of compensation and all terms and conditions of employment of the staff *except as may otherwise be provided in this article.*

(Emphasis added). We see nothing in the CAB's Opinion or in the record that would support a conclusion that Insight's application runs afoul of either of these provisions.

Certainly, the board of trustees of a charter school has the power under Section 1716-A(a) of the CSL to hire employees and, pursuant to Section 1724-A(a), to set its employees' compensation and terms and conditions of employment. As this Court recognized in *Collegium* and its progeny, a charter school board of trustees also has the authority to contract out for services. Section 1714-A(a)(5) of the CSL. Insight's Board, in its judgement, has elected to employ Insight's teachers, its student counselors, a CEO, and a Chief Financial Officer (CFO). (Agreement §§ 7.1, 7.4; R.R. 10a-11a, 211a.) Within two years of operation, Insight will also employ the school's principals and attendance and truancy coordinators. (Agreement § 7.4; R.R. 11a-12a, 211a.) Should it become necessary for other staff at the school to become employees of Insight, Insight may directly employ other staff at the school as well. (*Id.*)

Insight's Board has also, using its judgment, elected to contract with K12 for K12 to provide certain support staff, including, *inter alia*, an on-site executive director, principals (for up to two years),[7] operations manager, and

---

[7] The dissent contends that we should affirm the CAB's decision because an organizational structure where the principal of the charter school is an employee of a contracted service provider, and not the charter school, for any period of time violates Section 1716-A(a) of the CSL. (Dissent at 1-2.) Respectfully, the dissent diminishes the power of the board of trustees to contract for services under Section 1714-A(a)(5) of the CSL, by interpreting the Section 1716-A(a) power to employ as a mandate that the charter school *must* employ "to fulfill

**(Footnote continued on next page…)**

14

director of student services.  (Insight Application at 7-8; R.R. 89a-90a.)  Insight also meets the requirement of *Collegium* that the teachers be direct employees of the charter school.  There is nothing in Sections 1716-A(a) or 1724-A(a) of the CSL or our precedent that requires those serving in all other positions within a charter school to also be direct employees of the charter school and not employees of a contracted service provider.[8]

---

**(continued…)**

its responsibilities as set forth in Section 1716-A." (Dissent at 2.)  More critically, however, the CAB did not take this position anywhere in its Opinion, let alone assert it as a ground on which it denied Insight's charter application.  Not even the Department in its brief advocates the legal conclusion adopted by the dissent.  Accordingly, not only do we disagree with the dissent's legal analysis and conclusion, we disagree with the dissent's decision to raise an issue not properly before the Court.

[8] Section 1715-A(12) of the CSL, 24 P.S. § 17-1715-A(12), prohibits any person who serves as an "administrator" of a charter school from receiving compensation from (a) another charter school or (b) "a company that provides management or other services to another charter school."  For purposes of this provision, "administrator" is defined to include "the chief executive officer of a charter school and all other *employees of a charter school* who by virtue of their provisions exercise management or operational oversight responsibilities."  *Id*.  (emphasis added).  In this matter, the CAB expressly rejected in its Opinion the Department's contention below that the shared administrative and dual reporting structure proposed by Insight in its application violated this prohibition, noting its view that the Section 1715-A(12) prohibition, by its express terms, only applies to charter school employees who serve the school in an administrative capacity and not to employees of a contracted management company assigned to a charter school.  (CAB Op. at 17, n.12.)  The Department does not challenge the CAB's determination in this regard in its brief, nor does it anywhere in its brief cite the prohibition set forth in Section 1715-A(12) of the CSL.  Accordingly, the Court will not consider this issue in this appeal.

We note, however, that in *Richard Allen Preparatory Charter School v. School District of Philadelphia*, 123 A.3d 1101 (Pa. Cmwlth. 2015) (en banc), *appeal denied*, 145 A.2d 169 (Pa. 2016), this Court cited Section 1715-A(12) of the CSL in addressing a charter school's challenge to a charter condition that required, *inter alia*, teachers to be direct employees of the charter school and not the for-profit management company.  The only issue before the Court relative to staffing in *Richard Allen* was the argument by the charter school that teachers are not
**(Footnote continued on next page…)**

15

Under the terms of the Agreement, Insight's CEO will oversee the day-to-day operations of the school and assist the Board in its oversight and supervision of the Board's chosen management company, K12. The CEO will also be responsible for the school's compliance with applicable laws and its charter. The CFO will be responsible for the oversight and control of the school's fiscal affairs, including revenues, audits, and payments to K12. (Agreement § 7.1; R.R. 10a-11a.) K12 will employ an executive director and other administrative personnel, *but only with the Board's agreement*, and assign them to the school. (Agreement § 7.2; R.R. 11a (emphasis added).) The executive director "will be responsible for the overall implementation of [Insight's] programs and initiatives that are focused on achieving the educational goals, in each case, *as agreed upon in collaboration with the Board and the [CEO]*." (Agreement § 1.7; R.R. 5a (emphasis added).) The responsibilities of K12 staff working at the school as set by applicable law and "school policies," the latter of which are established by Insight's Board. (Agreement §§ 2.3, 3.5.1, 7.2; R.R. 6a, 7a, 210a.) All K12 staff

---

**(continued…)**

administrators and, therefore, need not be direct employees of the charter school. *Richard Allen*, 123 A.3d at 1118. In upholding this condition, the Court quoted from *Collegium*, which, as noted above, requires only that teachers be direct employees of the charter school. The Court, however, opined: "As established in [*Collegium*], the teachers in the [c]harter [s]chools, *as well as the administrators*, must be direct employees of each [c]harter [s]chool's board of trustees." *Id.* (emphasis added). Had the Department, in its brief in this matter, pressed its challenge to the CAB's interpretation and application of Section 1715-A(12) of the CSL, we would have been forced to reconcile the CAB's interpretation with this one sentence from our decision in *Richard Allen*. It is clear, however, that the staffing issue before the Court in *Richard Allen* was whether teachers must be direct employees of a charter school, an issue the Court had already resolved in *Collegium*, and not whether a management company is prohibited from employing administrative personnel and assigning them to a charter school under a contract for services.

assigned to the school must, in addition to reporting to their employer, K12, also report to Insight's CEO, a direct employee of the school and Insight's Board. (Agreement § 7.2; R.R. 210a; Application at 9; R.R. 91a.)

As noted above, the CAB took issue with the reporting structure of the school, particularly an organizational chart that depicts Insight's teachers reporting to the school principals, who will be K12 employees for up to two years under the Agreement. (R.R. 90a-91a.) The CAB extrapolated from this chart a conclusion that Insight's Board lacks real and substantial control over its own employees—that there is a "detachment between the teachers and the Board." (CAB Op. at 18-19.) Only by looking exclusively to the illustrative organizational chart, while at the same time ignoring the actual terms of the Agreement between K12 and Insight, can the Board's finding of a detachment between Insight's CEO and Insight's teachers be credited. By reading the illustrative organizational chart with the parties' Agreement,[9] it is clear that Insight, through its employed CEO, maintains real and substantial authority over Insight's employed teachers.

Under the management agreement in *Lincoln-Edison*, all staff of the charter school, save one, were employees of the charter school and not the service provider, Edison. The management agreement, however, extended certain employment authority over the charter school's employees to Edison. For

---

[9] "The relationship between the Parties was developed and entered into through arms-length negotiations and *is based solely on the terms of this Agreement*." (Agreement § 9.2 (emphasis added); R.R. 13a.) The dissent incorrectly claims that we have "dismiss[ed]" the organizational chart. As noted above, we have given the organizational chart appropriate consideration within the context of the parties' Agreement. The dissent commits the same error as the CAB, looking exclusively to the organizational chart while ignoring the terms of the Agreement.

example, Edison had the authority to determine school staffing levels and to select, supervise, evaluate, assign, and discipline personnel, up to and including the power to dismiss staff. *Lincoln-Edison*, 798 A.2d at 301 n.14. The school district in *Lincoln-Edison* complained that by granting this power to Edison, the board of trustees of the charter school ceded control over school employees to a third-party in violation of the CSL. As noted above, however, this Court rejected that contention, noting that the very same provisions in the management agreement reserved to the charter school's board of trustees final decision-making authority with respect to hiring and firing of personnel. With respect to compensation, the Court noted that compensation of employees was a budgetary matter and that the management agreement provided the board of trustees with final budget approval authority. Accordingly, this Court rejected the school district's challenge. *Id.* at 302-03.

If the level of supervision of the board of trustees in *Lincoln-Edison* was sufficient as a matter of law, then the same conclusion must be reached in this case, as the Agreement between Insight and K12 does not delegate to K12 anywhere near the level of supervisory power over Insight's employees that the board of trustees delegated to Edison in *Lincoln-Edison*. The Agreement in this case is quite clear: "The Board . . . is fully responsible for all governance of [Insight] and the employment of [Insight] employees, including certified teachers." (Agreement § 2.2; R.R. 5a.) K12 only "assist[s]" in the evaluation of Insight's teachers if so requested by Insight. (Agreement § 7.4; R.R. 12a.) Finally, as noted above, the CEO, a direct employee of the Board, broadly oversees the day-to-day operations of the school, which must be interpreted to include its employed teachers.

18

The CAB made much of the fact that the organizational chart depicts Insight's teachers as reporting *only* to the principals of the school and then up through the K12 academic chain of command. This fact, however, is of no legal significance for several reasons. First, as noted above, the Agreement provides that while the principals will be employed by K12 initially, within two years they will become employees of Insight. Second, as noted above, the Agreement provides that the CEO will have day-to-day supervisory authority over the school. Third, as noted above, the Agreement does not delegate any employment-related responsibilities to K12 with respect to Insight's teachers. And fourth, but perhaps most significantly, the CAB appears to ignore the fact that in addition to contracting for management services, Insight is contracting with K12 for educational products—*i.e.*, curriculum. (Agreement Part 3; R.R. 6a-7a.) It makes sense that K12 employees would oversee the implementation of this curriculum by Insight's teachers. We see nothing in the CSL that would prohibit the contracted curriculum provider from overseeing the implementation of its curriculum by the teachers within the school. Moreover, we cannot conclude that permitting such oversight deprives a charter school's board of trustees, which voluntarily entered into the agreement to procure the curriculum, of real and substantial control over the school.

The CAB also rejected the application because, in the CAB's assessment, the Board lacks real and substantial authority *over K12's employees*. Not surprisingly, the Agreement provides that K12 has the authority to exercise the typical powers one would expect of an employer as to its employees—*i.e.*, to determine compensation, hire, discipline, etc. *See Am. Road Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 615 (Pa. Cmwlth. 2012) (emphasizing

19

entity's ability to hire, fire, discipline, and set standards of conduct as indicia of employment relationship). We reject the CAB's legal conclusion that a contracted service provider must delegate these inherent employment rights to the charter school in order for a charter to issue. There is simply nothing in precedent or the CSL that requires a charter school board of trustees to insist, by way of an arms-length contract with a service provider,[10] on superseding the employment-related decisions of the contracted service provider vis-à-vis the provider's employees. Indeed, adopting such a requirement would essentially eviscerate the statutory option of charter schools, as recognized in *Collegium,* to *contract* for services.

The very concept of contracting for services envisions oversight over the contracted service provider's overall performance, not the individual performance of each employee of that service provider. In this regard, the Agreement vests in Insight's Board the "ultimate responsibility" for adopting policies governing the operation of the charter school, to which K12 (and its employees) *must* adhere. (Agreement §§ 2.3, 3.5.1; R.R. 6a, 7a.) *See Lincoln-Edison*, 798 A.2d at 300 (noting provision in management agreement

---

[10] Section 9.1 of the Agreement provides:

K12 is not a division or any part of [Insight]. [Insight] is a nonprofit corporation organized under State law and is independently governed by the Board. Neither [Insight] nor the Board is a division or a part of K12. The relationship between the Parties was developed and entered into through arms-length negotiations and is based solely on the terms of this Agreement. The Parties are independent contractors. Nothing herein will be construed to create a partnership or joint venture by or between [Insight] or the Board, on one hand, and K12 on the other hand.

(R.R. 13a.)

granting power of board of trustees to adopt policies governing day-to-day operations as evidence of "ultimate control" over charter school). Section 2.4 of the Agreement expressly grants oversight power to the Board with respect to K12:

> The Board, together with its [CEO], shall be responsible for monitoring and supervising K12's performance under, and compliance with, the terms of this Agreement in accordance with Applicable Law. The Board, together with its [CEO], shall also be responsible for overseeing [Insight's] and the K12 Executive Director's quality, operational and financial performance. K12 shall cooperate with such monitoring and oversight.

(R.R. 6a.) In the event K12 fails to fulfill its obligations under the Agreement, Insight may invoke its right to terminate for cause under Section 11.2 of the Agreement. (R.R. 14a-15a.) Thus, Insight has real and substantial control over K12's employees through its oversight of K12's performance under the Agreement.

We note, however, that several provisions in the Agreement actually cede to Insight some of K12's authority to hire, supervise, and discipline its employees. Section 7.2 of the Agreement provides that in addition to reporting to K12 as their employer, all K12 staff assigned to the charter school, for purposes of the charter school's operations, must report to Insight's CEO, an employee of Insight and direct report to the Insight Board. (R.R. 210a.) Under the Agreement, the CEO oversees the day-to-day operations of the charter school and assists the Board with its oversight and supervision of K12. Thus, the CEO, an Insight employee, oversees and supervises K12's employees at the charter school.

Moreover, Section 7.3 of the Agreement (R.R. 210a-11a) is a significant concession by K12 that gives Insight a real and substantial role in the discipline of K12 employees working at Insight. First, and critically, it recognizes

21

Insight's authority to demand removal of any K12 employee from the school should the employee's conduct threaten the immediate health or well-being of the enrolled students. Second, with respect to matters less serious and urgent, the Agreement recognizes Insight's authority to deal directly with a K12 employee and attempt to resolve performance concerns internally. Third, if efforts to resolve the matter internally fail, the Agreement provides a process for Insight to bring its concerns to K12, as the employer. Fourth, if K12 does not resolve the matter to the satisfaction of Insight, Insight may pursue mediation and, if unsuccessful, *binding* arbitration. This contractual right to force K12 to binding arbitration, where an arbitrator, and not K12, will make the ultimate determination over the fate of a K12 employee, is not trivial or inconsequential.

In short, Insight, directly and through its CEO who oversees the day-to-day operations of the school, has real and substantial control of its employees at the school, including the teachers. Insight has real and substantial control over K12's performance under the Agreement and, by extension, over the performance of K12's employees at the charter school. Finally, assuming arguendo that a charter school board of trustees must have some authority over disciplinary action against a contracted service provider's employees, the Agreement gives Insight real and substantial power over discipline of K12 employees, including the ability to invoke a process that takes discipline decisions out of the hands of K12 and places them in the hands of an arbitrator. The CAB erred in concluding otherwise.

## 2. Budgeting

With respect to the budgeting provisions of the Agreement and the related question of whether the Insight Board has real and substantial control over

the school budget, the CAB noted in its Opinion: "CAB finds the situation more complicated than either [the Department] or Insight postulates." (CAB Op. at 14.) It appears to the Court, however, that it is the CAB that has overcomplicated this inquiry.

The CAB concluded that the Agreement, with respect to the budget process, renders Insight a hostage to K12's budget demands, with no meaningful recourse. In support, the CAB cited language in the Agreement that authorizes K12 to terminate the Agreement if the Insight Board adopts a budget that fails to account for the payment of the fees due and owing to K12 under the Agreement. (Agreement § 11.1; R.R. 211a.) The CAB also pointed to a lack of any provision in the Agreement that would require, in the event Insight cannot afford to pay K12 what it is due under the Agreement, K12 to "reduce its fees to any extent necessary to achieve a positive operating result and allow the deficit to K12 to be carried over to the next year." (CAB Op. at 14-15.) The CAB concluded that Insight's Board "has little authority to dispute any proposed budget or budgetary changes." (*Id.* at 14.) The CAB expressed concern over what a termination of the Agreement by K12 for a budget inadequacy would mean to Insight, noting that such a termination would mean that Insight would be without necessary staff and services to run a charter school. (*Id.*) The CAB concluded, therefore, "that there is a discrepancy in bargaining power between K12 and Insight that is not adequately remedied in the Agreement." (*Id.* at 16.)

Another deficiency that the CAB identified was the lack of any alternative dispute resolution process in the Agreement for resolving budget disputes. As the CAB noted, Section 8.6 of the Agreement provides that Insight may submit a claim in writing to K12, challenging any charge invoiced by K12.

23

(R.R. 13a.) The provision is silent, however, on how such disputes are to be resolved. The CAB lamented as "problematic" that the Agreement provides no recourse for Insight and K12 to resolve such disputes other than resorting to "formal legal proceedings." (CAB Op. at 16.)

Each of these concerns is a legally insufficient ground to deny Insight a charter. As noted above, the test for "real and substantial" control requires consideration only of whether Insight cedes ultimate budgetary control to K12. Pursuant to the Agreement, it most certainly does not. The ultimate power to enact a budget lies in the Board, and not K12: "The Board will adopt an annual School budget for each Fiscal Year during the term." (Agreement § 4.1; R.R. 8a.) Under this provision and another provision that allows for budget modifications (Agreement § 4.2; R.R. 8a), then, and in furtherance of its fiduciary duty to the charter school and the students, Insight's Board has the power to enact a budget that reflects the school's fiscal reality. Insight's Board is under *no* contractual obligation to sacrifice the charter school's own financial stability to benefit K12.

The CAB found it significant that the Agreement allows K12 to terminate the Agreement if Insight fails to pass a budget that anticipates paying K12 for its services. Failure to pay for services would ordinarily trigger some sort of "for cause" termination in any services contract. The existence of this provision in the Agreement, therefore, would seem inconsequential and thus not newsworthy if not for the fact that the CAB seems to take the position that a chartering authority may lawfully deny a charter to a charter school applicant unless the service provider is bound to perform services for the charter school regardless of whether the charter school pays the service provider what the service provider is owed. This is a remarkable proposition and, like the CAB's apparent belief that a

24

charter school board of trustees must be able to exert employer-like authority over a service provider's employees, would essentially eviscerate the statutory option available to charter schools, as recognized in *Collegium,* to *contract* for services.

Equally unavailing is the CAB's complaint that the Agreement does not provide for a contracted dispute resolution process when it comes to budget disputes under Section 8.6 of the Agreement. First, there is no provision in the CSL that requires an alternative dispute resolution process. Further, we do not believe that the absence of such a process, leaving formal legal proceedings in the courts as the only avenue to address disputes, deprives charter schools of "real and substantial" control over budgetary matters. The courts of this Commonwealth are both adequate and appropriate venues to resolve contractual disputes. Second, however, and most compelling, is the fact that the Agreement between Insight and K12 *does* include an extensive alternative dispute resolution process in part 21, titled "Dispute Resolution, Venue and Governing Law" (R.R. 24a-25a), which applies to "any and all disputes arising in connection with this Agreement." (Agreement § 21.1; R.R. 24a.) It is clear from the CAB's analysis that it did not consider part 21.

Before the CAB, the Department contended that the Agreement does not provide Insight with the ability to terminate the Agreement if it lacks financial resources to pay K12. In its Opinion, the CAB did not expressly adopt this concern as a basis for upholding the denial of the charter to Insight. If it had, however, we would find this concern also inadequate as a matter of law to support denial of the charter. Part 4 of the Agreement provides that Insight is to work cooperatively with K12 in developing Insight's annual school budget. (R.R. 7a-9a.) This part also makes clear, however, that should Insight's Board

25

decide that it can no longer financially sustain its obligations to K12, then it may and should adjust the budget of the school accordingly. School districts make these decisions every year. Ultimately, then, the vendor must decide whether it wants to continue to provide services to the school under the financial terms set forth in the budget or exercise its right to terminate. This is exactly what Section 11.1 of the Agreement provides for—*i.e.*, the right of Insight's Board to make a budget decision that reflects the fiscal realities of the school and the ability of K12 to either terminate the Agreement or continue to provide services under the revised budget:

> K12 has the option to terminate this Agreement in whole or in part by providing written notice to [Insight] if the Board adopts an annual School budget, or budget modification, which reasonably anticipates the non-payment of K12's fee due under this Agreement that would materially increase the financial risk to K12 in providing the Educational Products and Services. . . . In the event that K12 elects not to terminate this Agreement in accordance with this provision, K12 may reasonably revise and determine the level of products and services to be provided in accordance with Applicable Law and in consultation with the Board or CEO, considering the Board's anticipated nonpayment of all fees due under this Agreement.

(R.R. 211a.) This hardly seems unreasonable, let alone unlawful under the CSL.

Finally, the CAB expressed concern over the impact a termination by K12 of the Agreement for nonpayment would have *on Insight*:

> Insight will be left with only a CFO and CEO and a teaching staff but no other administrative staff or curricular materials. Insight will then be without the services necessary to run a cyber charter school and maintain a comprehensive learning experience for its students. Even with the ninety-day buffer added to the Agreement, the majority of the staff and administration is employed by K12 and most if not all educational

26

materials belong to K12, leaving Insight essentially without operational capacity.

(CAB Op. at 15.) We acknowledge that K12's exercise of its termination right, should Insight conclude that it can no longer afford K12's services, *could* lead to the demise of Insight as a cyber charter school. Such, however, is not a *fait accompli*. In its Opinion, the CAB essentially assumed the worst case scenario.

There is some inconsistency in the CAB's Opinion with respect to termination rights under the Agreement. On one hand, the CAB suggested that Insight should be permitted to terminate the Agreement with Insight at will so as to have ultimate control over the school, but it does not express any concern over what such a termination right, if exercised, would mean to Insight's ability to operate. On the other hand, the CAB expressed concern over what termination of the Agreement by K12 for nonpayment could mean to Insight as a going concern. The reality is that schools, even public schools, fail and, ultimately, may be forced to close. In such an event, the focus must not be on the demise of the school, but the impact to the students that it serves.

The Agreement includes express provisions to mitigate against any disruption *to students* during a school year in the event of an adverse budget determination by the Insight Board. (Agreement § 11.1; R.R. 211a.) The Agreement provides first that K12 *may not* exercise its right to terminate without first giving Insight's Board 30 days' advance written notice of its intent to terminate, during which time K12 and Insight will attempt to work out their funding dispute. Only after this 30-day period can K12, if it chooses to, notify Insight of its decision to terminate the Agreement. Critically, the Agreement prevents any disruption for students during the school year by requiring notice of at least 90 days *prior to the commencement of the new school year* in order for the

27

termination to be effective. Combining the 30-day period with the 90-day period, Insight is afforded with *at least 120-days of advance notice*, during which time Insight can attempt to secure an alternative service provider or hire staff. If, however, K12 does not give 90-days' advance notice, then Insight has *even more time*—an entire school year—to contract with a new service provider or hire staff.

The bottom line is that notwithstanding the right of the service provider, K12, to terminate the Agreement for nonpayment—a right that is not unreasonable, the Agreement includes protections for both Insight and, more importantly, its students. Insight's Board retains ultimate control over whether it can or should budget to pay K12 its fees under the Agreement. *See Lincoln-Edison*, 798 A.2d at 300 (noting provision in management agreement granting board of trustees final budget approval authority as evidence of "ultimate control" over charter school). The Agreement provides a sufficient lead time for Insight to secure an alternative service provider or hire staff should K12 elect to terminate the Agreement. There is, however, yet another significant piece of the puzzle that the CAB overlooked. Even assuming Insight is unable to secure an alternative service provider or hire staff in time for the next succeeding school year following termination of the Agreement and, thus, must cease operation, Insight students will have the time and the ability to enroll in other schools, perhaps even brick and mortar public schools, within their local school district.

In short, the Agreement expressly grants full and final budget authority to the Insight Board. This is consistent with the management agreement approved in *Lincoln-Edison*. The CAB's grounds for concluding that Insight lacks real and substantial authority over the school budget are not supported by the CSL, are unrealistic and unreasonable in terms of a bargained-for relationship between a

28

charter school and a service provider, and are directly in conflict with the terms of the parties' Agreement. We, therefore, reject them as grounds to deny the charter in this case.

### 3. Curriculum

The CAB concluded that the Agreement fails to give Insight's Board real and substantial authority over the curriculum for the school in two ways. First, the Agreement does not permit Insight to terminate the Agreement if Insight's students fail to make reasonable academic progress. Second, the Agreement provides K12 the right of first refusal should Insight wish to provide additional educational products or services not contemplated in the Agreement, even if a more competitive price is offered by a third-party vendor. (CAB Op. at 20-22.)

Contrary to the CAB's conclusion, the Agreement provides Insight's Board the authority to terminate its relationship with Insight if Insight's students fail to make reasonable progress toward academic standards. Section 1729-A(a)(2) of the CSL, 24 P.S. § 17-1729-A(a)(2), grants a chartering authority the power to nonrenew or even revoke a charter if the charter school fails to meet student academic performance standards. *See New Hope Academy Charter Sch.*, 89 A.3d at 736-37. Section 2.8 of the Agreement expressly acknowledges this risk. K12 only gets paid if the charter school exists. (Agreement § 11.3 (relating to contract termination upon revocation or nonrenewal of charter); R.R. 15a.) K12, thus, is incentivized to ensure that students are succeeding at Insight.

Section 2.8 of the Agreement sets forth *how* K12 and Insight will work collaboratively to ensure that this doomsday scenario does not occur:

> The Parties understand and agree that [Insight] is subject to measurable academic performance standards, including those under 22 Pa. Code Ch. 4, the Elementary and Secondary Education Act of 1965, as amended by

29

[the] No Child Left Behind [Act] of 2001,[11] alternative standards approved for Pennsylvania under any waiver to such requirements as approved for Pennsylvania by the U.S. Department of Education, and academic accountability standards established by Pennsylvania, all as may be amended or superseded by the adoption of future requirements. At a minimum and for illustrative purposes, [Insight] shall be subject to a School Performance Profile ("SPP") score, which shall be considered [Insight's] academic performance score and details student performance through scoring of multiple measures that define achievement. The SPP also includes support to permit schools to access materials and resources to improve in defined areas related to achievement. Pennsylvania also requires that [Insight] comply with defined Annual Measurable Objectives, which includes measures of Test Participation Rate, Graduation/Attendance Rate, Closing the Achievement Gap for All Students, and Closing the Achievement Gap for the Historically Underperforming Students. In addition, any charter granted to [Insight] will incorporate academic achievement goals included as part of [Insight's] charter application and any amendments or renewals thereto.

To the extent that [Insight] does not meet the academic performance standards applicable to cyber charter schools in Pennsylvania, as explained in part above, or to the cyber charter school individually through the requirements of any Charter granted to it, (referred to collectively as "Academic Goals") the Charter may be subject to revocation or nonrenewal by action of the [Department] or [Insight] may be required to implement remedial actions satisfactory to the [Department]. Accordingly, the Parties agree that in any year following the first year of operation of [Insight] in which the cyber charter school fails to meet the Academic Goals, the Parties shall mutually agree upon a reasonable corrective action plan which may include added remedial support or

---

[11] 20 U.S.C. §§ 6301-7941.

> Student intervention programs, academic labs, supplemental test preparation, and school improvement programs and resources available through the [Department]. Such intervention methods shall be financed by K12 at no cost to [Insight], except that K12 shall not be required to finance the products or services if the failure to meet the Academic Goals is a result of actions or inactions of the Board, its CEO or its CFO. If the Academic Goals are not met because of one Party's failure to perform its obligations under the applicable corrective action plan, then the other Party may terminate this Agreement in accordance with Section 11.2.

The Agreement accurately summarizes the risk attendant to a failure by Insight and K12 to reach academic performance standards, it proposes a pathway to take corrective action should the charter school fail to meet these standards in any particular year, and it authorizes Insight to terminate the Agreement under Section 11.2 (for cause termination) if K12 fails to perform its obligations under any corrective plan.[12] This process appears to be consistent with how the

---

[12] It must be noted here that Insight and the Department negotiated the language in Section 2.8 of the Agreement. The language that appears in the Agreement in Section 2.8 is, in fact, the very language that the Department proposed to Insight, through Assistant Counsel Robert T. Datorre, Esquire, copied to Department General Counsel Nicole Bordonaro, Esquire. (R.R. 164a-67a.) Although not acknowledging in its brief that it proposed and thus acquiesced to the language in Section 2.8 of the Agreement, the Department, responding to Insight's arguments, notes that Section 2.8 of the Agreement "is irrelevant because CAB based its conclusion that Insight lacks ultimate control over curriculum on the fact that the Agreement contains the exclusivity and right of first refusal provisions." (Dep't Br. at 21 n.8.) This footnote passage, however, cannot be reconciled with the Department's claim in the body of its brief, wherein the Department contends that "the Agreement does not permit Insight to terminate the Agreement if its students fail to make reasonable progress toward academic standards." (*Id.* at 18.) The Court is troubled, to say the least, that the Department would make such a claim, fail to discuss in detail the very provision of the Agreement that addresses this subject (which it drafted), while at the same time in a footnote claiming that the very section is "irrelevant" to the discussion.

31

Department monitors and measures adequate yearly progress (AYP) toward educational goals of all public schools under the No Child Left Behind Act. *See Career Connections Charter High Sch. v. Sch. Dist. of Pittsburgh*, 91 A.3d 736, 741-42 (Pa. Cmwlth. 2014); *see also* 22 Pa. Code Ch. 4 (providing standards to measure public school academic performance).

Lost in the CAB's decision on this issue is context. Neither the CAB in its Opinion nor the Department in its brief cites to any specific statutory section, regulation, or legal precedent that requires all service provider agreements between a charter school and a service provider to be terminable after one year of a charter school's failure to reach AYP.[13] Certainly, a charter school and a service provider are free to negotiate such a provision. In the absence of any legal authority to the contrary, the charter school and its chosen service provider should also be free to negotiate what Insight and K12 have negotiated here. In *Lincoln-Edison*, this Court sided with the CAB in approving a charter school management agreement that gave the service provider one year to improve academic performance in the school. The Agreement here appears to be more collaborative than that in *Lincoln-Edison*, requiring both Insight's Board and K12 to work together and develop a plan to improve the academic performance of the charter school, under the direction of the Department. A provision in a service agreement that affords the service provider, working collaboratively with the school, an opportunity to improve academic performance prior to termination of the service agreement does

---

[13] The CSL does not authorize a chartering authority to revoke or nonrenew a charter if a school fails to meet academic standards in a single year. *See New Hope Academy*, 89 A.3d at 731 (noting that nonrenewal was based on *pattern* of poor academic performance and not results from single year).

not diminish the real and substantial control of the board of trustees over the school. *Lincoln-Edison*, 798 A.2d at 300-01.

The CAB's concern that Insight cannot choose another management company should budget constraints demand is also unfounded. As noted above, Insight's Board of Trustees retains full and final budgetary authority. If Insight cannot afford K12's services, it has the power to enact a budget that reflects that fiscal reality. K12 must then decide whether it wishes to continue to provide services to Insight or not. If the latter, Insight can choose another management company that can provide similar services at a lower cost.

Similarly, we find nothing legally deficient about Section 9.4 of the Agreement, which grants K12 a right of first refusal with respect to products or services not contemplated in the Agreement. (R.R. 14a.) This section provides, in relevant part:

> Moreover, [Insight] shall be permitted to procure goods and services from any third party to the extent required by Applicable Law or the Charter, *provided that such goods and services are not included in the Education Products and the Educational Services.* Prior to any third party procurements, [Insight] shall give K12 a thirty (30) day right of first refusal to provide such services or goods not enumerated herein (or in the future), and, *if K12 is able and willing to provide such services or goods*, [Insight] shall procure them from K12.

(Agreement § 9.4 (emphasis added); R.R. 14a.) The CAB read this language as requiring Insight to bypass a third-party product that may be a better fit for the school and, more critically, less expensive than a K12 alternative. We see nothing in this language, however, that would allow K12 to dictate the price that Insight must pay if K12 invokes the right of first refusal provision. Rather, if K12 does offer the good or service that Insight seeks, the language requires that Insight

procure the good and service from K12 only if K12 *is able and willing* to provide it. Given the fact that Insight has ultimate control over its budget, K12 may not be able or willing to provide its good or service at a price that Insight can afford. Insight would then be able to procure the good or service from an alternative provider.

The powers reserved to the Insight Board in this case with respect to academic performance of the school and rights to terminate its chosen service provider are consistent with the arrangement approved by this Court in *Lincoln-Edison.* As in this case, in *Lincoln-Edison* the chartering authority claimed that the charter school did not have real and substantial control over the school, ceding too much to the service provider. In rejecting that argument, we specifically noted that Lincoln-Edison (the charter school) had the authority to terminate Edison (the service provider) (a) if the school failed to make reasonable academic progress, provided that Edison would have one academic year to remedy the failure; and (b) if Edison materially breached its agreement with the school and failed to remedy the breach within 90 days. *Lincoln-Edison*, 798 A.2d at 300-01. Here, as noted above, Insight too has the contractual authority to terminate the Agreement should the school fail to make reasonable academic progress, after a period of corrective action. Insight may also terminate the Agreement in the event of a material breach by Insight. Accordingly, consistency with *Lincoln-Edison* requires that we reject the CAB's conclusions in this case.

In short, the Agreement expressly provides that Insight and K12 mutually share the risk that the school may lose its charter should it fail to meet academic standards established by the Department—a risk that all public schools bare. The Agreement, however, expressly requires Insight and K12 to work

34

cooperatively to implement corrective action, under the supervision of the Department, should Insight fail to meet these standards. Failure of K12 to meet its obligations in this regard is expressly defined as a material breach of the Agreement, triggering Insight's right to terminate the Agreement for cause. Coupled with the Insight Board's control over the budget, Insight's Board will have real and substantial control over the academic affairs of the school, and the CAB erred in concluding otherwise.

## B. Necessary Financial Support and Planning

The other legal ground on which the CAB affirmed the Department's denial of Insight's application was the CAB's legal conclusion that "Insight failed to demonstrate the necessary financial support and planning to operate a cyber charter school." (CAB Op. at 11 (conclusion of law 10).) To support its denial on this basis, the CAB cited only to Section 1719-A(9) of the CSL, 24 P.S. § 17-1719-A(9). Section 1719-A(9) of the CSL provides that a charter school application must include "[t]he financial plan for the charter school and the provisions which will be made for auditing the school."

As the CAB recognized in its Opinion, this is not a rigorous requirement. (CAB Op. at 29 ("[T]he CSL does not require a high degree of specificity.").) To satisfy it, the charter school need not even submit a specific line-item budget. The CSL does not authorize, let alone require, the chartering authority or the CAB to approve or disapprove a charter school's proposed or final budget plan. Perceived deficiencies in particular budget line items are not grounds for denying a charter. To the contrary, at the charter school application phase, the budget plan need only be detailed enough to allow the chartering authority and the CAB on appeal to "determinate that the applicant is capable of providing a

35

comprehensive learning experience for students." *Central Dauphin Sch. Dist. v. Founding Coal. Infinity Charter Sch.*, 847 A.2d 195, 202 (Pa. Cmwlth.) (en banc), *appeal denied*, 860 A.2d 491 (Pa. 2004). As this Court recently stated in an unreported panel decision, "[a] financial plan only has to show that it has considered the budgeting issues and that based on reasonable assumptions, *it will have the necessary funds to operate the school it proposes*." *McKeesport Area Sch. Dist. v. Young Scholars of McKeesport Charter Sch.*, (Pa. Cmwlth., No. 373 C.D. 2015, filed July 13, 2015) (emphasis added).[14]

The CAB, however, did not apply this standard. The CAB expressed no concern in its Opinion that Insight's application failed to show that Insight will have the necessary funds to operate the charter school or that the Insight application failed to provide sufficient information for the CAB to make such a determination. Instead, the CAB approved the denial of the charter because the CAB was "confus[ed]" by "multiple budget items" and the role of Insight's CFO in the financial operations of the school. (CAB Op. at 29.) Regardless of whether the CAB's concerns are well-founded, they do not, as a matter of law, justify denial of a charter under Section 1719-A(9) of the CSL as the CAB and this Court have previously interpreted and applied that provision. The CAB's determination that Insight failed to satisfy Section 1719-A(9) of the CSL must, therefore, be reversed.

## III. CONCLUSION

As part of Insight's appeal from the Department's denial, the CAB rejected many of the reasons that the Department advanced for denial of Insight's

---

[14] Unreported decisions of this Court may be cited for their persuasive value. Internal Operating Procedures of the Commonwealth Court § 414(a), 210 Pa. Code § 69.414(a).

36

application. It should have, however, rejected all of them. The *Collegium* test arose out of a concern that a for-profit service provider would exert ultimate control over the operations of a charter school, in violation of provisions in the CSL that require ultimate control to lie within the school itself through its board of trustees. There is absolutely no evidence in the record of this case that Insight's Board lacks independence from K12. Where there is such independence, and in the absence of evidence of unequal bargaining power, the board of trustees must be permitted to exercise its best judgment in its negotiations with service providers. Only where the exercise of that judgment conflicts with the law should the Department and the CAB intervene and reject, or grant with conditions, a charter application. Though couched in terms of legal deficiencies, both the Department's and the CAB's objections to the terms of the Agreement, as amended, are in actuality efforts by both to substitute their judgment for that of the independent Insight Board.

The CAB's decision below and the Department's objections to the issuance of the charter in this case are not grounded in any specific provision of the CSL, are inconsistent with how this Court has defined and applied the "real and substantial" test in *Collegium* and its progeny, and, in some respects, if credited would render illusory the statutory authority given to charter schools to contract for services. Based on the terms of the Agreement, as amended,[15] read in conjunction with Insight's application, Insight's Board has real and substantial control over the

---

[15] "[T]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo*, and our scope of review is plenary." *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009).

staffing at the school as well as academics and the budget. The alleged deficiencies that the CAB perceived in the arrangement between K12 and Insight do not rise to the level of legal deficiencies that would justify outright denial of a charter to Insight. Moreover, the CAB applied an improper legal standard when evaluating compliance with Section 1719-A(9) of the CSL.

For these reasons, the CAB's August 31, 2015 Opinion and Order will be reversed and the matter remanded to the CAB to direct the Department to issue a charter to Insight.

_____
P. KEVIN BROBSON, Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Insight PA Cyber Charter School,     :
              Petitioner     :
                            :
          v.                 :     No. 1866 C.D. 2015
                            :
Department of Education,         :
              Respondent    :

# **O R D E R**

AND NOW, this 18th day of May, 2017, it is hereby ORDERED that the Opinion and Order of the Charter School Appeal Board (CAB) is REVERSED, and this matter is REMANDED to the CAB to direct Respondent the Pennsylvania Department of Education to issue a charter to Insight PA Cyber Charter School.

Jurisdiction relinquished.

                    _____
                    P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Insight PA Cyber Charter School,  :
                    Petitioner    :
                                  :
          v.                      :
                                  :
Department of Education,          :    No. 1866 C.D. 2015
                    Respondent    :    Argued:  February 8, 2017


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICAEL H. WOJCIK Judge
           HONORABLE JULIA K. HEARTHWAY, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


DISSENTING OPINION
BY JUDGE COSGROVE                  FILED:  May 18, 2017


        Because I believe the Board of Trustees (Board) lacks real authority over Insight's necessary professional staff as required by Section 1716-A of the Charter School Law (CSL),[1] I respectfully dissent.

        Section 1716-A of the CSL unequivocally provides that the "board [of trustees has] the authority to employ, discharge *and contract with* the necessary professional and nonprofessional employes subject to the school's charter and the provisions of this article."  By the terms of the Amended and Restated Educational Products and Services Agreement (Agreement) between Insight and K12, it is K12 (and not the Board) which is responsible for hiring all student support staff

---

        [1] Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1716-A.

(defined in Section 7.4 of the Agreement as any position which provides direct services to the school and its students, with the exception of certified teachers or student counselors).

The Majority notes that, "[w]ithin two years of operation, Insight will also employ the school's principals…" *See Majority,* slip op. at 14. Section 1716-A, simply does not permit such employment by another entity. Had this section provided that the Board may *contract* for the necessary professional and nonprofessional employees, it would suggest the Board had the authority to delegate this responsibility and allow another entity to contract with the necessary professional and nonprofessional employees, whether immediately or in two years' time. Unfortunately, it does not. While *West Chester Area School District v. Collegium Charter School,* 812 A.2d 1172 (Pa. 2002) recognized the authority of a charter school board of trustees to contract for services, that case does not stand for the proposition that a charter school may contract with another entity to fulfill its responsibilities as set forth in Section 1716-A. *See Collegium,* 812 A.2d at 1185 (Section 1714-A of the CSL expressly permits a charter school to make contracts and leases for the procurement of services, equipment and supplies).

Neither can I dismiss, as does the Majority, the proposed organizational chart provided by Insight when submitting its application and which "helps to illustrate the school's governance structure." (Reproduced Record (R.R.) at 90a.) This chart very clearly depicts all teachers as falling under the authority of the principals, who will be K12 employees for the first two years of the school's inception. (R.R. at 91a.) The duties of the principals, as outlined in Insight's application, include "supervision… to the instructional staff." (R.R. at 90a.) As a

result, while teachers may be employees of Insight, they will be governed and supervised by employees of K12, the for-profit entity.

Given these discrepancies, I cannot join the Majority.


_____
JOSEPH M. COSGROVE, Judge